344 So.2d 1080 (1977)
Thomas C. McLURE, Plaintiff-Appellant,
v.
ALEXANDRIA GOLF AND COUNTRY CLUB, INCORPORATED, Defendant-Appellee.
No. 5856.
Court of Appeal of Louisiana, Third Circuit.
April 13, 1977.
*1081 McLure & McLure by John G. McLure, Alexandria, for plaintiff-appellant.
Gold, Hall, Hammill & Little by F. A. Little, Jr., Alexandria, for defendant-appellee.
Before GUIDRY, FORET and HEARD, JJ.
GUIDRY, Judge.
In this suit plaintiff seeks judgment recognizing that certain property of defendant owes a predial servitude of passage to a 69 acre tract of land owned by him. Plaintiff further seeks judgment permanently enjoining defendant from interfering with such right of passage and for damages for the cost of restoring a gravel road and gate. Defendant, hereinafter sometimes referred to as the Country Club, denies that plaintiff's estate is entitled to the claimed servitude and specifically urges that the claimed servitude of passage was personal to plaintiff's ancestor in title, a Mr. Naaman A. Kaiser, and expired with him. In the alternative, the Country Club prays that if plaintiff's estate be entitled to a right of passage over its property that the court declare the nature of said right of passage which should be limited to a single foot path. Defendant also reconvenes for damages in the amount of $7500.00.
In his reasons for judgment the trial judge set forth a detailed narrative of the facts and summary of the evidence which we take the liberty of quoting:
"On September 21, 1945, Naaman A. Kaiser was the owner of a 104.45 acre tract of land fronting in part on the east side of U.S. Highway 165. On that date he sold the property to the Alexandria Golf and Country Club, Inc. The president of the Country Club, Mr. C. M. Waters, Jr., signed the cash sale on behalf of the purchaser. The document was drafted by an attorney representing the Country Club. The act of sale (P-7) contained the following agreements relative to the right of Mr. Kaiser to remove certain structures and to have an outlet or lane to U.S. Highway 165:
`It is agreed and understood between the parties that the vendor herein does reserve from this transfer and conveyance the house in which he is now living, the barn and the other small out houses around the barn and all of the inside fences, and the Vendor shall have until October 13, 1945, within which to remove these improvements from the lands herein transferred. All other fences and improvements *1082 on these lands are included in this transfer and conveyance and title thereto shall become vested in the said vendee.
It is further agreed and understood between the parties that in the event the vendor herein acquires the property lying East of that involved in this transfer and does erect thereon a home, then and in such event the vendee herein agrees to allow the vendor an outlet to Highway No. 165 and over and across the property herein purchased, as well as over and across any other property that vendee may hereinafter acquire, provided however, that the location of this lane or outlet shall be selected and designated by the vendee herein and the vendor shall have the obligation of maintaining this lane or outlet.'
On December 27, 1945, Naaman A. Kaiser acquired a 69-acre tract in a partition. (P-10) The tract lies immediately east of the 104-acre tract sold by him to the Country Club. Testimony indicated that he had this acquisition in mind when he bargained for the above quoted agreements with the Country Club.
By dation en paiment executed on August 8, 1959, Kaiser conveyed the 69-acre tract to his wife, Bertha D. Kaiser. (P-9)
Subsequent to Naaman Kaiser's death, Mrs. Kaiser sold the property in question to Roger G. McCoy, Jr., in an act of sale dated September 24, 1965. (P-6)
Roger G. McCoy, Jr., sold the 69 acres to Robert E. McGill, Jr., on March 4, 1966. (P-1) On March 16, 1973, McGill sold an undivided one-half interest in the 69 acres to plaintiff, Thomas C. McClure, (sic) Jr. (P-2B). McLure acquired the remaining interest from McGill on April 17, 1974. (P-2A) McLure is now the sole owner.
The defendant Country Club developed the 104-acre tract into a golf course with improvements such as a club house, tennis courts, swimming pool, and various other facilities including parking areas.
Kaiser was a tailor by trade. He farmed some of his 104 acres and conducted his business as a tailor in Alexandria. At the time of the sale to the Country Club he was known not to own an automobile and had never been known to own one. He walked to and from work although his house, located on the 104 acre tract, was several miles from the city. Upon acquiring the 69-acre tract, Kaiser had his house, barn and other buildings dismantled and built a house and barn on the 69-acre tract.1 The evidence
1 See rough sketch attached adapted from aerial photograph, P-3.
established that at some time he had a telephone installed. The house was served by electricity and butane gas. Possibly the electricity was not run to the house until after 1948. The poles used to run the line across the golf course are still in place on number 11 Green. (Testimony of Fred Ames.) A water pump was operated by electricity. A butane tank weighing approximately 200 pounds and measuring approximately 36 inches in diameter was installed on the property.
A butane truck regularly delivered butane to Kaiser's house using a route across the golf course. It may be assumed that service trucks for the telephone and electricity used the same access. Friends used the same approach by automobile at least every six weeks. Kaiser's minister called on him by automobile using the route in question. A gate existed in the fence separating the golf course property and the 69 acres. At the request of the parties the undersigned viewed the scene and was conducted over the golf course and a portion of the 69 acres. The place where the gate formerly was located is indicated by two telephone poles serving as posts in the existing fence. This gate was removed by the Country Club after plaintiff's acquisition of the property and this action is one of the bones of contention in this suit. Grass now covers what was the alleged roadway from the club house to the fence gate location. However, for the most part the configuration of the ground discloses the location of what evidently was at one time a lane or narrow road of some kind. It leads in the direction of the gate location. For part of the way from the club house the land was at one *1083 time graveled but was a dirt road for the last hundred yards or so to the gate. At least one culvert was located beneath the roadway to permit water from a slope to the north to pass under the roadway.
At the time of the inspection of the premises by the undersigned the house had been torn down for some time, but its location was quite evident. The concrete steps were in place. Parts of the electric pump were in place and other indicia of location were clearly discernable. The barn was standing but in a dilapidated condition. A graveled drive could be located through the trees and underbrush leading from the house north-westerly toward the gate location. Leaves covered the drive but the gravel could be easily seen by brushing the leaves aside. The drive made a loop at the homesite. Proceeding along the route of the drive from the homesite northerly in the direction of the gate location, one arrives at an old bridge over a branch. The bridge is wide enough to accommodate an automobile. While it may not be sound today, it is made of sizable timbers which appear to be of sufficient size so as to have supported vehicles such as automobiles and butane gas trucks. It was by no means a foot bridge.
Prior to Kaiser's death Mr. Roger G. McCoy, Jr., visited the Kaisers in 1956 and 1958. In all he made about a dozen trips. On each occasion he used a visible roadway leading from the Country Club parking lot to the gate between the golf course and the Kaiser property. The route never changed. Mr. McCoy drove his car over the road and the club management was aware of his use of the road. No one ever barred his passage or challenged his right to use it. The route he followed was from the parking lot, by the tennis courts and across the fairway to the gate. Inside the Kaiser property Mr. McCoy would turn to the right (south) and go 200 to 300 yards to get to the Kaiser residence.
Mr. Kaiser died in 1957 or 1958. Prior to that time the Kaisers had acquired an old green Mercury automobile which Mrs. Kaiser drove. Mr. Kaiser died at his home and a hearse transported his remains from the home.
As noted above, McCoy purchased the 69-acre tract from Mrs. Kaiser on September 24, 1965. He sold it to McGill on March 4, 1966. McCoy was last physically on the property in 1966 at the time of the sale to McGill and the route across the golf course was still unchanged at that time.
McGill never lived on the 69-acre tract. He did have a telephone in the house for office purposes. His son slept in the house from time to time. The butane tank was filled about once. An employee of McGill went to the property from time to time. McGill knew of no route other than the gravel road across the golf course fairway and there was only one gate. McGill had flown over the property from 1966 to 1969 and was familiar with the property as it appeared from the air. Aerial photos P-3, P-3A, P-4, and P-4A were admitted in evidence and McGill testified the roadway across the golf course fairway shown on the photos correctly portrayed the location of the roadway in question. He explored the property and was unable to locate any other outlets.
In 1973 McGill moved a small bulldozer on to the 69 acre tract. He began knocking down underbrush and small trees. McGill maintains that no one ever restricted or barred his use of the roadway across the Club fairway. He denies that the Country Club threatened to use injunctive procedure to stop him from bringing heavy equipment across the Country Club property. He did admit meeting with representatives of the Country Club at the time he had the dozer on his property. Mr. Donald Chambers was president of the Country Club in 1973 and was chairman of the Club's greens committee for two years prior to that. Chambers testified that a meeting was held by Club officials with McGill to get him to desist from using the Country Club property, or not to use it for transporting heavy equipment. It was stipulated that Judge Guy E. Humphries, Jr. would testify to the same effect. For whatever reasons he may have had, McGill did not go further with clearing operations.
*1084 At some time McGill gave the house on the 69-acre tract to Claude Guidry, assistant pro at the Country Club and Mr. Guidry dismantled the house. All that remains is described above. Plaintiff McClure (sic) acquired a half interest in the 69-acre tract on March 16, 1973, and the full interest on April 17, 1974. McLure had visited the property prior to acquisition. He visited it frequently after acquisition. He was never interfered with until the events complained of in this suit. He allowed his family and a few friends to go to hunt on it. McLure testified that because he was a member of the Club himself (president in 1965), he avoided using the roadway in bad weather so as not to damage the fairway number 10 and 11. This would appear to corroborate the fact that the last portion of the roadway across the Club property (that portion nearest the 69-acre tract) was not graveled. McLure appears to have been solicitous of the Club's interest, and as president attempted to get the Club to purchase the property when it was then for sale.
It was stipulated that Lawrence Coco and Lewell E. Breithaupt, Jr. and various others would testify they had traveled the roadway in question by vehicle within a year of filing suit without disturbance by the Country Club.
On behalf of defendant various witnesses other than Donald L. Chambers and Judge Guy E. Humphries, Jr. were called including Martin Braswell, John E. McGilprey and Charles M. Water, Jr.
Martin Braswell was the first golf pro at the Country Club. Construction and development of the golf course was begun while he was there and Braswell and his wife lived on the Country Club property. They were there during 1945, 1946, and 1947. Braswell knew the Kaisers and saw Mr. Kaiser nearly every day from 1945 through 1947. Braswell located Kaiser's former homestead as having been in the area of the tennis courts shown on photo P-3. There was a road to the tennis courts but only a path from there to the 69-acre tract. (This would appear to be corroborated by photo P-5 objected to by defendant and excluded as evidence for lack of foundation. Plaintiff offered the aerial photo marked P-5 as purporting to show the situation on the ground of the alleged date of the photograph, January 24, 1951.
Braswell testified that at the time he lived on the Country Club property Kaiser had no electricity and not much else. Kaiser's friends drove across the fairway to visit him but Kaiser always notified him when he expected anyone. There was a gate through the fence between the Country Club property and the Kaiser 69-acre tract. Braswell stated he had no objections to Kaiser's guests driving across the golf course when the ground was dry. Prior to the construction of the Country Club's road to the Club house from U.S. Highway 165, and when Kaiser owned and lived on the 104-acre tract, Kaiser reached his former home by a road that ran through the Robi property to the south.
John E. McGilprey came to work for the Alexandria Golf and Country Club in about 1951. Except for a 9-month period he had worked for the Club 24 years. He has lived in the Forest Hill area all of his life and knew the Kaiser property bought by the Country Club when Kaiser still owned it. He was acquainted with Kaiser before he sold his original 104-acre to the Club. McGilprey testified that Kaiser moved his house to the 69-acre tract east of No. 11 Fairway after his sale to the Club. At that time Kaiser had no automobile but he bought a car before he became ill and Mrs. Kaiser learned to drive it. There was no special route Kaiser used in walking across the golf course. Sometimes McGilprey drove Kaiser to Alexandria, and he drove over whatever route was convenient so as to avoid golfers. He referred to a `path' which once existed as now being covered with grass.
On cross examination McGilprey testified that a gate into the Kaiser 69 acres was replaced at the time Everette Wilkins was President of the Country Club during the 1960's but noted there had always been a gate there. The location of the gate may be established today from two old light *1085 poles which were used as gate posts east of 11 Fairway and which are still in place. (These were observed by the undersigned.) McGilprey admitted he worked on a roadway to the Kaiser property and graded gravel on it. This was the only road to the Kaiser 69-acre tract. Some people going to the Kaiser home used the road and some simply went through the `rough'. In any event McGilprey admitted there had always been a lane in the area in question and a butane truck serving the Kaiser's used it. He stated that gravel on the road did not go beyond the tennis courts and the rest of the road was a dirt road. The road can be located under the grass at this time and the route is no less passable than at any time previous.
Mr. Charles M. Waters, Jr., was called by defendant to testify as to intentions of Kaiser and the Country Club with reference to the provision in the sale between Kaiser and the Club concerning the outlet or lane which was granted to Kaiser. Waters negotiated the purchase of the property from Kaiser and was president of the Country Club in 1944, 1945, and 1946. Plaintiff objected to the testimony on the legal ground that oral (parol) testimony is not admissible to vary the terms of a written contract and particularly in transactions affecting land or real estate. The testimony was admitted subject to the objection in order to make it part of the record, but this was one of the legal issues of the case to be argued and briefed by counsel and decided by the court after the trial evidence had been taken.
In essence, it was Waters' testimony that he thought the word "outlet" in the act of sale meant a walk, or rather the right to walk across the property anywhere he wanted to. This was based on the fact that Kaiser owned no automobile and walked primarily as a means of travel. It was Waters' opinion that the right was to cease to exist upon Kaiser's death but he conceded that he thought the rights would survive in his wife. He also admitted the right would extend to visitors and relatives and a butane truck. It was Waters' assertion that insofar as the Kaisers were concerned, the Country Club had `closed its eyes' to vehicular traffic which crossed the Country Club property to get to the Kaiser's new home location on the 69-acre tract.
The events or occurrences which precipitated this litigation as alleged in plaintiff's petition were the actions of defendant, within one year previous to filing of the suit consisting of the removal of the gate leading into plaintiff's 69-acre tract and extending the fence across the gate opening and the removal of at least a portion of the roadway from the Club's parking lot at the Club house. The road location is described in paragraph 10 of the petition. The road is described in plaintiff's petition as `gravel and dirt'. Plaintiff alleges he sought to amicably adjust his injury by letter calling the defendant's attention to his rights and requesting that the roadway not be disturbed because he claimed a servitude of passage over the road based on the provisions for an outlet or lane in the Kaiser sale to the Country Club. The petition alleges the defendant did in fact disturb his peaceful possession of his servitude in the latter part of March of 1975 by removing the gravel from the road and in November or December of 1974 by removing his gate and closing the fence. This suit was filed on April 2, 1975.
Contained in the suit record are items of correspondence attached to plaintiff's supplemental petition. Attached as Exhibit No. 1 is a copy of a letter dated March 5, 1974, by John G. McLure, plaintiff's son and attorney, to the defendant which on its face appears to have been written on behalf of McGill although at that time plaintiff owned a one-half interest in the 69-acre tract. This letter notes that the Club's bulletin contained mention of getting rid of the gravel in the road and, without actually protesting on behalf of McGill, it was suggested that the Club was bound to permit McGill ingress and egress and that the Club's best interests would be served by not removing the gravel. Exhibit No. 2 is a copy of a letter signed by the Club's president to John G. McLure to reply to the March 5, 1974, letter. In this letter the *1086 Club's president asserted that neither McGill nor any one else had any right to traverse the property. Exhibit No. 3 attached to the supplemental and amended petition is a copy of a letter from plaintiff himself to the defendant, dated December 16, 1974, noting that his gate had been taken down and the fence extended so as to cut off access to his property. McLure stated his intention to continue to use "a servitude of passage" across the property of the Country Club to enter the property. He offered to reimburse the Club if it would put up a gate with locks on it.
Norman J. Budd, who is himself a member of the defendant Club, testified that he, as a contractor, was engaged by the Club to lay asphalt walkways and a driveway from the Club's parking lot northwesterly. The graveled portion of the former road was obliterated or covered over. In addition to this work, certain grading destroyed the roadway as a gravel road in the tennis court area. In part it may be that the roadway was simply covered over. During the view of the scene, the undersigned noted one small area of exposed gravel at the easterly end of what was evidently the former graveled portion of the road.
Mr. Budd testified that to return the road to its former status it would be necessary to add gravel or dig down to the original gravel. He would recommend adding gravel and this would cost from $300.00 to $400.00. According to Budd this estimate had reference solely to the gravel that he disturbed and this ran from the parking lot to the tennis courts. (At the time the undersigned viewed the scene the Club's tennis courts were being extended in an easterly direction. Therefore, the undersigned is not certain in all instances in which witnesses referred to the location of the tennis courts whether they referred to the present or former situation).
On cross examination, Budd testified that the route represented by the former road can still be traversed except in bad weather. Budd had been a member of the club for eight or nine years and knew of no way to get (sic) the 69-acre tract except (sic) the road in question. He stated that the route or road is now overgrown by grass but there is a culvert in place under the road on No. 10 Fairway and a bridge on No. 11 Fairway."
On the basis of the above findings of fact, which are not seriously disputed, the trial court rendered judgment as follows:
"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:
1. It was the intention of Naaman A. Kaiser and the Country Club that the outlet or lane granted to Kaiser in the Kaiser-Country Club deed with reference to property Kaiser acquired east of the Country Club property be for the advantage of the land itself and not expire at Kaiser's death.
2. The location of the right of passage was established by the process of use of the right and it is shown on exhibit P-3 as a white line (road and passage way running from Point A on U.S. Highway 165 to point B on the Kaiser-McLure property line).
3. The right of passage is limited to vehicular traffic of the type represented by passenger automobiles, farm trucks and service trucks such as butane trucks. The traffic volume should be limited to no more than required for a house serving one family, a one-family dwelling and its out buildings. The passage should be no less than twelve feet wide.
4. Plaintiff has the right to use the passageway in its present condition, that is, ungraveled and covered with grass. Inasmuch as the Country Club's evidence establishes that the route is no less passable now than when a part of it was graveled, no damages will be allowed for removal of gravel.
5. The Country Club will replace the gate opening into the McLure property and therefore no damages for its removal shall be allowed.
6. Alexandria Golf and Country Club, Incorporated is permanently enjoined from interfering with the exercise of the servitude of passage through their property to the property formerly belonging *1087 to Naaman A. Kaiser and currently owned by Thomas C. McLure consistent with the written reasons for judgment.
7. All costs of this suit shall be assessed to the defendant, Alexandria Golf and Country Club, Incorporated."
After granting a new trial, limited to re-argument only, the trial court amended its original judgment so as to delete therefrom any specification as to the minimum width of the right of way (see sub-paragraph 3 above) and amended sub-paragraph 4 to read as follows:
"4. The defendant, Alexandria Golf & Country Club, Inc. shall restore the condition of the servitude as a gravel road to its former condition or in the alternative pay the plaintiff the sum of $300.00, with legal interest thereon from date of judicial demand until paid."
Except as amended the original judgment was re-instated and made the judgment of the trial court.
Plaintiff, Thomas C. McLure, appealed and assigns as error the trial court's restriction of the servitude of passage as set forth in sub-paragraph 3 of the judgment. Appellant further suggests error because the trial court's reasons for judgment imply that the Country Club could change the nature of the surface of the right of way at their whim and caprice and that plaintiff-appellant would have no right to complain as long as he could somehow still get to his property some of the time. The Country Club has answered the appeal of plaintiff and finds error in the entire judgment however, in the alternative it prays that if on appeal it be found that a predial servitude does exist same be limited to vehicular traffic of a volume sufficient to serve a one family dwelling; the right of passage be limited to twelve feet; and, the judgment insofar as it casts the Country Club in damages be reversed.
The substantial issues on appeal are:
1. Did the servitude of passage reserved in the deed from Naaman Kaiser to the Country Club expire at Kaiser's death?
2. If not, in what manner may the servitude be used?
3. If the servitude is subject to vehicular travel did the trial court err in restricting its use as set forth in sub-paragraph 3 of the judgment?
4. Did the trial court err in failing to specify the width of the servitude as demanded by the Country Club in its reconventional demand?
5. Did the trial court err in casting the Country Club in damages for removing gravel from the right of passage?
DID THE SERVITUDE OF PASSAGE RESERVED IN THE DEED FROM NAAMAN KAISER TO THE COUNTRY CLUB EXPIRE AT KAISER'S DEATH?
The trial judge, in a rather lengthy but extremely well reasoned opinion, determined that the servitude in question was a predial or landed servitude reserved for the benefit of the 69 acre tract owned by plaintiff and therefore same did not expire at the death of Naaman Kaiser but rather presently exists in favor of that estate. We agree with this conclusion and are pleased to adopt, as our own, the trial court's reasons in support thereof.
"The principal issue in this case is whether or not the right of passage granted by the Country Club to Naaman A. Kaiser over the 104-acre tract expired with him, or if not with him, then with his wife. Defendant contends parol evidence may be admitted to show the intention of the parties. If the servitude did not expire with the Kaisers, then other issues include the nature and extent of the servitude and whether damages are due, and if so, how much.
A basic provision of statutory law of this state, which figures in all of the arguments and theories advanced by the parties to this litigation, is the opening article of Title IV, Book II of the Louisiana Civil Code on the subject of predial servitudes. Article 646 reads in part as follows:
`All servitudes which affect lands may be divided into two kinds, personal and real.

*1088 Personal servitudes are those attached to the person for whose benefit they are established, and terminate with his life. This kind of servitude is of three sorts: usufruct, use and habitation. Real servitudes, which are also called predial or landed servitudes, are those which the owner of an estate enjoys on a neighboring estate for the benefit of his own estate.
They are called predial or landed servitudes, because, being established for the benefit of an estate, they are rather due to the estate than to the owner personally.'
As will be demonstrated later in these reasons for judgment, the classification of servitudes into predial and personal is not necessarily exclusive, nor will classification invariably determine whether the creation of a right in the nature of a servitude of passage runs with the land or dies with the person to whom it is granted.
In the briefs submitted on behalf of the parties, both sides make a threshold approach of the same nature. Both contend that classification of the servitude as either predial or personal will determine whether the servitude is perpetual in favor of the 69-acre tract or whether it ceased to exist when the trial was transferred by Mr. Kaiser, or at least when it was transferred by Mrs. Kaiser. The parties differ, in their conclusions on this question. The undersigned has concluded that the resolution of the conflicting claims is not necessarily dependent upon such a classification. The final analysis will turn primarily upon a determination of what the parties intended by their writing. If an interpretation can be made from the writing itself, resort may not be had to extrinsic evidence in making the interpretation. The intent of the parties can be established from their written words and the analysis to follow will show that parol evidence is not admissible.
The Louisiana Civil Code contains Articles 753 through 758 which bear upon matter of classification. The parties apparently agree that articles in this area are applicable, but each relies upon certain articles and denies the applicability of others. Each relies upon articles deemed to support the position taken by the party.
The plaintiff relies principally upon Article 756 of the Civil Code and a consideration together with it of Articles 754 through 757. Article 756 declares as follows:
`If the right granted be of a nature to assure a real advantage to an estate, it is to be presumed that such right is a real servitude, although it may not be so styled.
Thus, for example, if the owner of a house contiguous to lands bordering on the high road, should stipulate for the right of passing through lands, without it being expressed that the passage is for the use of his house, it would be not the less a real servitude, for it is evident that the passage is of real utility to the house.'
Defendant denies that Article 756 is controlling or that Articles 754, 755, and 757 are applicable. Defendant does not place its reliance upon codal provisions as it contends that the language of the servitude grant is sufficient in itself to support defendant's interpretation of its meaning. Defendant asserts the following in its brief:
`It is the position of the Country Club that the right of passage was granted to Kaiser and that same was personal to him and expired when he expired. The Kaiser-Country Club deed is explicit, unambiguous and clear. The right was given to the vendor, i. e., Mr. Kaiser. The granting language does not run in favor of the vendor, his heirs or assigns, but only in favor of Kaiser. What could be clearer? If there is doubt, the language should be interpreted against the (un) restricted use of the property as Civil Code Article 753 provides:
"Servitudes which tend to affect the free use of property, in case of doubt as to their extent or the manner of using them, are always interpreted in favor of the owner of the property to be affected. (Emphasis supplied)."'
In other words, defendant denies that resort to codal authority is necessary to establish the intent of the granting provision, *1089 but defendant contends, that if any `doubt' exists, Article 753 is the article to apply, rather than Article 756 together with the series of articles running from 754 through 757. The undersigned is not of this opinion. Although Article 753 has been given a broader meaning, McGuffy v. Weil, 240 La. 758, 125 So.2d. 154 (1960), it will be noted that by its own terms Article 753 is limited to employment with respect to doubt as to the extent or manner of using a servitude rather than as a guide in determining intent to grant a perpetual servitude as opposed to one of a lesser duration measured by the life span of the party to whom the servitude is given or the time he owns the property. See Clause v. Broussard, 146 So.2d 828 (La.App., 3rd Cir. 1962).
The undersigned agrees that the granting language is not ambiguous. It is certainly not ambiguous merely because the parties disagree as to its meaning. Nevertheless, the court's conclusion that there is no ambiguity does not mean that defendant's interpretation of the language is the correct construction. Also the absence of ambiguity prohibits resort to codal articles such as Article 753 which might otherwise be applicable. In any event, even were there (sic) ambiguity, not only should Article 753 be considered, but also Articles 754 through 758 and the general codal rules laid down in the Civil Code for construction of juridical acts, Articles 1945-1962.
Prior to a discussion of codal authorities and jurisprudence which are applicable, it is appropriate to consider defendant's argument that the servitude did not outlive Kaiser because it was given to `vendor' and not to `vendor, his heirs and assigns.' It has been specifically held that the addition of such language is not necessary for property rights in the nature of a servitude to pass to one's heirs. Ford v. Williams, 189 La. 229, 179 So. 298 (1938). See also the article in 45 Tulane Law Review 459 to be discussed below.
The most persuasive argument asserted by defendant with reference to the meaning of the language granting the servitude is as follows:
`. . . the language is all of a personal nature. The vendor (Naaman A. Kaiser) must acquire the adjoining property, the vendor must erect a home on the property, the vendee (Country Club) must select a lane or outlet for passage, and the vendor must maintain the same.'
In arguing thusly, defendant asserts that the grant must have been intended for Kaiser personally and for him only. In this connection it should be noted that in the articles of the Civil Code on the subject of predial servitudes (Articles 646-682), conditional grants of predial servitudes may be made.
Article 747 provides:
`A servitude may be established or acquired in favor of an estate which does not exist, or of which one is not yet the owner; but if the hope of becoming the owner be not realized, the servitude falls. It may also be stipulated that an edifice not yet built, shall support a servitude; or, shall have the benefit of one when it is built.'
Since the Civil Code contemplates and authorizes conditional predial servitudes of precisely the nature granted to Kaiser, there is no justification for concluding that a right limited is (sic) Kaiser's personal use was intended. As noted above it is not necessary to add the words `heirs and assigns' to the word `purchaser' in a title to a servitude for it to be heritable or transferable.
It would seem reasonable to believe that acquisition of `the property lying to the east' as a condition of the grant to Kaiser was simply a protective measure adopted by the Country Club to apply in the eventuality that Kaiser failed to acquire the 69-acre tract in the partition as he expected to. At the time Kaiser and the Country Club contracted, a servitude grant, not conditioned, would no doubt have resulted in granting a servitude in favor of the whole property of which the 69 acres was a part, an act the Club might not have been willing to do. It has been held that a servitude of passage may be made in favor of an estate owned by a third party, one not a party to the *1090 contract that is, through a stipulation pour autri. Mallet v. Thibault, 212 La. 79, 31 So.2d 601 (1947). In like view, the provisions that Kaiser erect a home on the tract could simply mean that the Country Club wished to assure itself that Kaiser intended using the property for residence purposes.
To assume that Kaiser contracted with the knowledge that if he acquired the 69-acre tract and built his house on it and invested in improvements to it and the land, but that he could never sell it or that it could not be inherited, is not a logical assumption.
The undersigned is of the opinion that the language of the servitude provision was meant to grant a servitude of passage in favor of such property as Kaiser should thereafter acquire `lying east' of the tract purchased by the Country Club, provided he built a home on the property he acquired. The servitude would exist in favor of whomever might thereafter own it or acquire it in whatever manner. As noted above, the property was transferred by Naaman A. Kaiser during his lifetime to his wife by dation en paiment. There is no evidence of any effort to terminate her right to passage or that of her transferee, Roger G. McCoy, Jr. The Country Club made no move to terminate use of the servitude until within one year of the filing of this suit. The confrontation with Robert McGill, Jr. had reference, insofar as the evidence disclosed, only to the use of the servitude for transporting heavy equipment across the Country Club property. Such a use, the undersigned believes, was not within the contemplation of the parties to the original contract. However, there is no evidence that McGill was ever stopped from traversing the Country Club by use of ordinary vehicles, and plaintiff and his invitees and family did so until the gate into his property was removed. Hence, it would appear that the use of the servitude was honored for almost thirty years before the incidents complained of in this suit.
The matter of predial servitudes has been the subject of two extensive articles by Professor A. N. Yiannopoulos in 29 La.L. Rev. 1 (1968) and 45 Tul.L.Rev. 459 (1971).
The second of the two articles deals with principles of particular significance here. See pages 459-460, 493-496 and 502-509. The following quotations are set forth from these pages as being applicable:
`The predial servitude is traditionally defined as a charge or burden laid upon one estate for the use, benefit, or advantage of another. Such servitudes may be established on immovable property, whether public or private. The essential features of a predial servitude are: (1) two different estates, one owing the servitude to the to (sic) other; (2) two different people, one person owning the benefited estate and the other person owning the encumbered estate; and (3) the object of benefiting the estate favored by establishment of the servitude.
Predial servitudes differ from personal servitudes in that the number of personal servitudes is limited (the rights of usufruct use, and habitation), whereas predial servitudes, also known as real or landed servitudes, are of so many varieties that enumeration is impractical; personal servitudes may burden both movables and immovables, whereas predial servitudes are charges laid on an immovable; personal servitudes are established in favor of a person whereas predial servitudes are established in favor of an immovable; and personal servitudes terminate with the life of the beneficiary whereas predial servitudes are ordinarily perpetual.'
* * * * * *

CONTRACTUAL INTERPRETATION

In General
`Contracting parties dealing with immovables do not always carefully designate the kind of right they intend to establish. Instead of using the proper name they describe the right. The question frequently arises whether the instrument was intended to transfer ownership, to establish a dismemberment of ownership, or to impose merely personal obligations.
The resolution of this question is a matter of contractual interpretation and is governed by both the general rules for construction of juridical acts and the rules of *1091 construction applicable specifically to instruments purporting to create servitudes.
A cardinal rule of contractual interpretation is that the intention of the parties must govern. Intention `must be determined from the stipulation in the entire instrument, with a view of giving effect to all of the provisions therein contained and thereby avoid neutralizing or ignoring any of them as surplusage.' Extrinsic evidence is clearly admissible to prove the intention of the parties to an ambiguous instrument. Precise technical terms are not necessary to create a predial servitude, nor is use of the word servitude sacramental. For example, a contract provision granting `the privilege of using' a driveway has been held sufficient to create a predial servitude of passage. The parties to a contract may even use common law terminology to establish a valid predial servitude under the civil law. On the other hand, use of the word servitude or (sic) or equivalent expressions is not determinative in the presence of provisions irreconcilable with the notion of predial servitudes.
Another cardinal rule of contractual interpretation is, in case of doubt, instruments purporting to establish a predial servitude `are always interpreted in favor of the owner of the property to be affected.' This rule incorporates the civilian principle that any doubt regarding the free use of immovable property must be resolved in favorem libertatis. The Louisiana Supreme Court has repeatedly declared that `servitudes are restraints on the free disposal and use of property, and are not, on that account, entitled to be viewed with favor by the law.' Therefore, `servitudes claimed under titles are never sustained by implicationthe title creating them must be express, as to their nature and extent, as well as to the estate owning them, and the estate to which they are due.' * * *
Insufficient descriptions of the location or extent of a predial servitude may be remedied by actual exercise of the servitude over part of the servient estate. * * * Extrinsic evidence to clarify vague or ambiguous description is certainly admissible. In Burgas v. Stoutz,1 an act of sale provided
1 The cited case is reported in 174 La. 586, 141 So. 67 (1932).
`the purchaser, its successors and assigns, shall have the privilege of using the paved driveway in the rear of the (vendor's) property.' A subsequent purchaser of the vendor's property contested the validity of the grant by alleging that the failure to state the length and width of the driveway made the description too vague, too uncertain, and too indefinite to give a good faith purchaser notice. The court held: `(T) his particular ground of attack is without merit, since the paved runways are located as physical objects on the surface . . . as shown by photgraphs (sic) filed in evidence, and the length and width of same are easily ascertainable. That which can be made certain is considered in law as certain.' Indeed, since the property had only one set of runways, describing the driveway as located `in the rear' of the vendor's property was neither misleading nor erroneaous (sic). And, since the instrument creating the servitude was recorded, the purchaser could have discovered the true facts before purchasing the property.
* * * * * *
Predial Servitude, Personal Servitude, or Personal Obligation
When contracting parties do not specify the kind of right they intended to create, the question may arise whether they intended to create a predial servitude, a personal servitude, or merely a personal obligation. This question is resolved in Louisiana by applying Civil Code articles 754-58, the rules of interpretation used to ascertain the kinds of rights created by juridical acts lacking express designation. These articles have no analogue in the Civil Codes of France, Germany, or Greece; they were first introduced in the 1825 Louisiana Civil Code and were based on Toullier's treatise.
Article 754 of the 1870 Louisiana Civil Code declares: `Servitudes being established on estates in favor of other estates, and not in favor of persons, if the grant of the right declare it to be for the benefit of another estate, there can be no doubt as to the *1092 nature of this right, even though it should not be called a servitude.' Thus, when a right of passage is expressly reserved `for the benefit and advantage of the property,' a predial servitude is clearly established. But when the act establishing the servitude either does not declare that the right is given for the benefit of an estate or declares that the right is given for the benefit of an estate or declares that the right is given to the owner of an estate, whether the parties intended to create either a predial servitude or another right is to be determined by applying articles 755-57. Article 755 provides:
"If . . . the act establishing the servitude does not declare that the right is given for the benefit of an estate, but to a person who is the owner of it, it must be considered whether (from its nature) the right granted be of real advantage to the estate, or merely of personal convenience to the owner."

Article 756 provides:
"If the right granted be of a nature to assure a real advantage to an estate, it is to be presumed that such a right is a real servitude, although it may not be so styled."
Thus, for examples, if the owner of a house contiguous to lands bordering on the high road, should stipulated for the right of passing through (these) lands,. . . it would be not the less a real servitude, for it is evident that the passage is of real utility to the house."

And article 757 declares:
"If, on the other hand, the concession from its nature is a matter of mere personal convenience, it is considered personal, and can not be made real but by express declaration of the parties.
Thus, for example, if the owner of a house near a garden or park, should stipulate for the right of walking and gathering fruits and flowers therein, this right would be considered personal to the individual, and not a servitude in favor of the house or its owner.
But the right becomes real and is a predial servitude, if the person stipulating for the servitude, acquires it as owner of the house, and for himself, his heirs, and assigns."
Whether an instruments created a predial servitude or merely a personal obligation was the question in Burgas v. Stouts (sic). An act of sale stipulated that `the purchaser, its successors and assigns, shall have the privilege of using the paved driveway in the rear' of the vendor's property. The act had been recorded, but the words `its successors and assigns' were omitted from the public records. A subsequent purchaser of the vendor's property, relying in part on the omission of those words, argued the recorded act had established merely a personal obligation. The court found a predial servitude established by the act of sale as originally executed, because the right of passage was acquired by the purchaser as owner of an estate and for his successors and assigns. But, since the act, as recorded, granted the right of passage to the purchaser only (and did not declare that the right was given for the benefit of an estate), the court felt the issue ought to be determined in light of the tests furnished by articles 755-57. In the court's opinion, the right of passage was of utility to the property; the right gave the property `more free space either for building or for flowers, or for a garden' and made the property `more desirable and valuable.' The court bolstered its conclusion (the act, as recorded, established a predial servitude) by observing that the right of passage was given not to a named individual but to the purchaser, `thereby connecting the servitude with the property as a real advantage to it, and not as a mere matter of convenience to a particular person and terminating with him.'
The question whether property is burdened with a predial servitude or is used through a personal right may also arise in the absence of any title. This question is likewise to be resolved by applying articles 755-57. In Levet v. Lapeyrollerie,2 counsel argued
2 The cited case is reported in 39 La.Ann. 210, 1 So. 672 (1887).
that a right of drain was a predial servitude acquired by prescription rather than a personal *1093 right established in favor of a dissolved partnership. The court found the right of drain to have been established for the benefit of a tract of land by viewing the right `of such advantage to (the tract) that, without it, the tract should not be successfully cultivated.' Supported by this finding, the court held the claimant of the servitude entitled to the full benefit of the presumption of article 757 and recognized the servitude.
Instruments raise not only the question whether contracting parties intended to create a predial servitude or a personal obligation, but also the question whether contracting parties intended to create a predial servitude or a limited personal servitude, a real right of enjoyment other than usufruct, use, or habitation. Articles 755-58 indicate that contracting parties may create either predial servitudes or merely personal obligations. Actually, in addition to furnishing rules for the interpretation of juridical acts, these articles authorize, by clear implication, the creation of limited personal servitudes as well as the creation of predial servitudes and personal obligations. Toullier, whose test was closley (sic) followed by the redactors of the 1825 Louisiana Civil Code, had originally declared that personal servitudes other than usufruct, use, and habitation were forbidden and that rights of enjoyment that do not qualify as predial servitudes or a usufruct, use, or habitation, were necessarily personal obligations. He revised this view, however, in the third volume of his treatise, concluding that a real right of enjoyment, binding on all subsequent acquirers of the property, may be validly stipulated in favor of a person rather than an estate. This right would not be a predial servitude because it would terminate with the life of the beneficiary; nor would it be a personal service (sic) forbidden by article 686 of the Code Civil. (sic)
The obvious conclusion is, then, that the expression `personal to the individual' in articles 757 and 758 of the 1870 Louisiana Civil Codes (sic) does not mean that if a right is not a predial servitude it is necessarily a personal obligation binding only the parties to the agreement. The right may also be a limited personal servitude expiring upon the beneficiary's death in the absence of contrary stipulation. If the right were necessarily a contractual right of enjoyment, it should not terminate upon the beneficiary's death. Obligations are, in principle, heritable; only personal servitudes, real rights of enjoyment, terminate upon the beneficiary's death. Of course, usufruct, use, and habitation may not become heritable by contrary stipulation, but, in contract, limited personal servitudes may validly be stipulated as heritable. * * *
Under both Civil Code and special legislation, the content of predial servitude may be stipulated as a limited personal servitude. In the early case of Declouet v. Borel,3 one of the parties to a contract of
3 The cited case is reported in 15 La.Ann. 606 (1860).
exchange reserved for himself, his heirs and assigns, the right to cut timber on the other party's property. The party contended that the right reserved as either a predial servitude or, at the least, a personal servitude transferable to heris (sic) and assigns. The court held that no predial servitude was established, because the right had not been reserved in favor of an estate but in favor of named persons. Further, the court held that no personal servitude was created, because if personal servitudes were `capable of such perpetuity by inheritance and transfers as contemplated by plaintiff, it is obvious that titles to estates would become by their complications far removed from that simplicity which has ever been the policy of our own law to preserve.' The court, therefore, regarded the words of inheritance as not written and concluded that the contract established purely personal rights. Insofar as this case refuses to recognize the validity of limited personal servitudes, it must be considered overruled.
In Simoneaux v. Lebermuth & Israel Planting Co.,4 the court seemed willing to recognize
4 The cited case is reported in 155 La. 689, 99 So. 531 (La. 1924).
a right of passage as a valid personal servitude. Plaintiff had granted to defendant a right of way over her property to construct a railway needed to transport *1094 crops to defendant's refinery. Years later, defendant sold both the refinery and the right of way to a third person. Plaintiff sued to annul the grant, contending it was a personal servitude granted in favor of the defendant and could not be transferred. The court declared:
"The right granted, whether it be considered a real or a personal servitude, may be sold . . . If the right granted be considered a personal servitude, we think that its sale is authorized by article 2449 of the Civil Code . . . There is nothing in article 758, cited by plaintiff, that provides to the contrary, directly or indirectly. All that the article provides is that, unless the contrary be expressly stipulated, a servitude personal to the (sic) the individual expires with him. If the servitude in contest be considered personal, it can be so considered only in the sense that it is not predial, or in favor of an estate. It cannot be considered personal in the sense of being nonheritable or nontransferable. It is only to personal servitudes that are nonheritable or nontransferable that article 758 refers."
In a subsequent case, Mallet v. Thibault,5
5 The cited case is reported in 212 La. 79, 31 So.2d 601 (La. 1947).
the court clearly recognized the validity of limited personal servitudes, finding a servitude of passage had been established in favor of a person.
"(We) are not unmindful of Article 709 of the Code which seems to forbid conventional establishment of a servitude in favor of a person. However, that article cannot be reconciled with Articles 757 and 758 which are contained in Section 2 of Chapter 4 of Title IV dealing with the establishment of servitudes and which provide directly to the contrary . . ."
Thus the creation of a personal servitude by convention will be approved provided, of course, that it does not contravene the public order.'
Research of the jurisprudence supported by the conclusions of the author of the law review article quoted above, discloses that the intention of the parties is the primary guide for interpretation of contractually created servitudes. Classification may include, not only predial and personal servitudes, but what professor (sic) Yiannopoulos refers to as "limited personal servitudes which are real rights of enjoyment established for both predial and personal servitudes. This analysis assists in resolving the apparent conflict which exists between Civil Code Articles 646 and 709, which forbid the establishment upon estates of servitudes in favor of persons rather than in favor of other estates, and Articles 758 which appears to contemplate that such can be done. Frost Johnson Lumber Co. v. Sallings' Heir, 150 La. 756, 863-864, 91 So. 207, 245 (1922).
It is the conclusion of the undersigned that the applicable Civil Code Articles are 755 and 756. Burgas v. Stoutz, 174 La. 586, 141 So. 67 (1932); Levet v. Lapeyrollerie, 39 La.Ann. 210, 1 So. 672 (1887); Greco v. Frigerio, 3 La.App. 649 (La.App.Orl.1926).
The undersigned agrees with Professor Yiannopoulos that Article 754 is the beginning article in the interpretative series to be applied. 45 Tul.L.Rev. 459, 502. Article 754 provides for the situation where the parties spell out their intention. Article 755 provides for the situation where the parties do not spell out their intention. Article 756 is a follow up article, as is Article 757.
Article 755 provides as follows:
"If, on the other hand, the act establishing the servitude does not declare that the right is given for the benefit of an estate, but to a person who is the owner of it, it must then be considered whether the right granted be of real advantage to the estate, or merely of personal convenience to the owner."
Article 756 provides:
`If the right granted be of a nature to assure a real advantage to an estate, it is to be presumed that such a right is a real servitude, although it may not be so styled.
Thus, for example, if the owner of a house contiguous to land bordering on the high road, should stipulate (contract) for *1095 the right of passing through lands, without it being expressed that the passage is for the use of his house, it would be not the less a real servitude, for it is evident that the passage is of real utility to the house.'
The clear import of these two articles of the Civil Code is that it is not necessary to specify in a title granting a servitude of passage that it be for the benefit of the estate of the person to whom it is granted for it to be a real servitude or predial servitude, and thus run with the land rather than be limited to the ownership of the land by the person. Clearly, the grant to Kaiser by the Country Club was not `merely of personal convenience' to Kaiser, but was of `real advantage to the estate', the 69-acre tract. Thus, `it is presumed that such right is a real servitude,' although it was not `so styled.'
Inasmuch as there is no ambiguity in the title in question, the parol evidence admitted subject to plaintiff's objections may not be considered. It is appropriate to note that, in any event, it was not shown that what Mr. Waters considered to be the meaning of the servitude grant, was in fact concurred in by Kaiser.
The undersigned concludes that a servitude of passage exists in favor of the 69-acre tract belonging to plaintiff over the Country Club property."

IN WHAT MANNER MAY THE SERVITUDE BE USED?
The trial judge concluded that the right of passage reserved in the Kaiser deed contemplated vehicular as well as foot traffic. We agree and adopt as our reasons those assigned by the trial court.
"The next question to be decided is the nature of the servitude of passage existing in favor of McLure, that is, the manner in which he may use it and its demensions (sic).
Initially, it should be noted that the language of the provision containing the grant does not speak merely of an `outlet' to U.S. Highway No. 165, but twice in (sic) the provision refers to it as `this lane or outlet'. Resort to standard dictionary definitions of the word `lane' reveals that an accepted meaning of the word is that it is part of road wide enough to accommodate a vehicle traveling in one direction. Funk & Wagnalls Standard Handbook of Synonyms, Antonyms and Prepositions by James C. Fernald states that `a lane is a narrow, rural road often bordered by hedges, or a passageway between rows of people.' The mere employment of the word `lane' is clear indication that something more than a foot path was intended.
Although it contends that McLure no longer has a right of passage, the Country Club makes an alternative argument that the right should be limited to foot traffic. The Country Club urges that Article 780 of the Louisiana Code should apply inasmuch as the deed granting the right of passage does not specify the width or manner of use. Article 780 reads as follows:
"If the title by which a passage is granted does not designate its breadth, nor the manner in which it is to be used, whether on foot, or horseback, or with carriages, the use which the person to whom the servitude is granted previously made of it will serve to interpret the title.
If there was no such use made of it before, the probable intention of the parties must be considered, and the purpose for which the passage is granted.
If these circumstances can afford no light, it must be decided in favor of the land which owes the servitude, and a foot passage must be conceded eight feet wide, where it is straight, and ten feet wide where it turns."
The Country Club urges that under the `probable intention' test referred to in Article 780 the servitude should be limited to foot traffic because every witness testified that Mr. Kaiser did not own a car and did not know how to drive one. Moreover, the last sentence of Article 780 provides that if the `circumstances can afford no light, it must be decided in *1096 favor of the land which owes the servitude, and a foot passage must be conceded eight feet wide, where it is straight, and ten feet wide where it turns.' The undersigned is of the opinion that the word `lane' as used in the language granting the right of passage contemplated vehicular traffic. While it might well have been expected that the principal use would be pedestrian, as was Kaiser's custom, the word `lane' means a passage way which would accommodate vehicular use as well as pedestrian use. In fact, Mr. Waters conceded that service agency vehicles would be expected to use the right of passage. However, as to Kaiser himself, it must be remembered that he had employed part of his 104 acres which he sold to the Country Club for farming. Before he sold he had a barn and he built a barn on the 69-acre tract. Barns and farming imply that farm vehicles will be used. At the time Mr. Kaiser lived, a wagon was no doubt an item he might employ. Its present day counterpart is the farm truck.
It will be noted that Article 780 states that `the probable intention of the parties must be considered, and the purpose for which the passage is granted.' Use of the word `lane' precludes the necessity for engaging in speculation, but the circumstances are not as all persuasive that probable intention was oriented to foot traffic. The undersigned is of the opinion that probable intention and purpose for which the passage is granted must be interpreted with the ordinary meaning of the word `lane' in mind. There should be no reason to concede that a butane truck servicing Kaiser's home could legally use the servitude, but that the Kaisers should never be permitted to use a vehicle of their own. The evidence establishes that the Kaisers did eventually acquire an automobile and Mrs. Kaiser learned to drive it. There was no evidence made (sic) of any opposition having been made by the Country Club to the Kaiser's owning and using an automobile in traversing the Country Club property. No opposition, until within one year of filing of this suit, was made to subsequent owners of the tract using automobiles to get to the tract. The only opposition made was to transporting heavy equipment over it. The permitted use of automobiles in the past should, in the opinion of the undersigned, support the interpretation that the word `lane' contemplated the use of automobiles and occasional service type trucks or vehicles required to service a house on the 69-acre tract. This, no doubt, is the meaning of Article 780 in stating `the use which the person to whom the servitude is granted previously made of it will serve to interpret the title.'"

DID THE TRIAL COURT ERR IN RESTRICTING THE USE OF THE SERVITUDE AS SET FORTH IN SUBPARAGRAPH 3 OF THE TRIAL COURT JUDGMENT?
The trial court concluded that the language of the reservation contained in the Kaiser-Country Club deed contemplated a one-family use of the servitude and accordingly, although he recognized the continued existence of the servitude, he restricted its use as follows:
"3. The right of passage is limited to vehicular traffic of the type represented by passenger automobiles, farm trucks and service trucks such as butane trucks. The traffic volume should be limited to no more than required for a house serving one family, a one-family dwelling and its out buildings.
We find that the trial court erred. We know of no authority and have been cited to none which would support a restrictive limitation such as that imposed by the trial court upon the exercise of a predial servitude of passage. We recognize that the parties may by their contract limit the extent and mode of using a servitude of passage (R.C.C. Article 722; Rock Island A. & L. R. Co. v. Gournay, 205 La. 164, 17 So.2d 21 (La.1944), however we find no language in the granting instrument in this case which would serve to support the limitation imposed, i. e., . . . "traffic volume *1097 . . . limited to no more than required for a house serving one family, a one-family dwelling and its out buildings." The limitation imposed is clearly contradictory to the conclusion of the trial court that the servitude reserved by Kaiser was a predial servitude as opposed to a personal servitude or a limited personal servitude. The limitation imposed by the trial court limits the use of the servitude reserved to one person and his family which would be in effect a limited personal servitude (Mallet v. Thibault, supra) transferable by deed (Simoneaux v. Lebermuth & Israel Planting Co., supra). We have previously indicated our concurrence with the trial court's determination that the servitude reserved was a predial servitude of passage. Such a servitude exists in favor of the entirety of the dominant estate and in the event that the dominant estate is divided the servitude remains due for each divided portion, provided however, that in the event of the latter no additional burden be imposed on the servient estate. R.C.C. Articles 656 and 776. The holding of the trial court is clearly contrary to this codal authority. Accordingly, we conclude that the trial court erred in imposing on the servitude of passage owed to the plaintiff's estate the restrictive limitation set forth in sub-paragraph 3 of the trial court judgment.
The trial judge in his reasons for judgment stated that the language of the grant would hardly support an interpretation that would permit extensive development of the 69 acre tract and accordingly imposed the restrictive limitations. We make no decision in regard to whether or not the extensive development of the 69 acre tract would place an additional burden on the servient estate (R.C.C. Article 776) as that matter is not now before us.

DID THE TRIAL COURT ERR IN FAILING TO SPECIFY THE WIDTH OF THE SERVITUDE AS DEMANDED BY THE COUNTRY CLUB?
The trial court in its original judgment although refusing to fix an exact dimension for the right of passage decreed that the right of passage should be no less than twelve feet. On rehearing the trial judge amended his original judgment to delete therefrom the minimum width specified. The Country Club has answered the appeal of plaintiff and prays that the trial court judgment be amended so as to set forth with specificity the breadth of the right of passage. We conclude that the trial court erred in failing to grant this relief to defendant-plaintiff in reconvention.
The Country Club is clearly entitled to have determined with exactness the "breadth" of the servitude enjoyed by plaintiff's estate. R.C.C. Article 780. The term "breadth" is defined in Webster's New Twentieth Century Dictionary, unabridged, second edition, as follows:
"The measure or extent of any surface or thing from side to side; width."
The title granting the passage in controversy is silent as to the width of same. The cited article sets forth the method to be used, under such circumstances, for determining the width of the passage, i. e., "the use which the person to whom the servitude is granted previously made of it . . . ." Considering the use which the servitude owners have made of the servitude over the past thirty plus years, the history of which use has previously been set forth herein, we fix the width of the right of passage owed to the plaintiff's estate at twelve (12) feet. See Patin v. Richard, 291 So.2d 879 (La. App. 3rd Cir. 1974) writ denied, 294 So.2d 827 (La.1974).
At this point we observe that neither plaintiff nor defendant question correctness of the trial court's location of the route of the servitude across defendant's property which was established by use. J. C. Trahan, Drilling Contractor Inc. v. Younger, 169 So.2d 15 (La.App. 2nd Cir. 1964) and Wild v. LeBlanc, 191 So.2d 146 (La.App. 3rd Cir. 1966).

DID THE TRIAL COURT ERR IN CASTING THE COUNTRY CLUB IN DAMAGES FOR REMOVING GRAVEL FROM THE RIGHT OF PASSAGE?
On original hearing the trial court determined that the removal of gravel from a *1098 portion of the roadway used by plaintiff did not diminish plaintiff's use of the right of way or tend to make it more inconvenient. R.C.C. Article 777. Accordingly, he disallowed any damages to plaintiff in this regard. On rehearing the trial court concluded that since plaintiff may at some future time wish to gravel that portion of the road nearest him, which has never been surfaced with any material, he has been damaged by the loss of wet weather negotiability of that portion of the road previously graveled. Accordingly the trial court granted plaintiff judgment in the amount of $300.00, being the cost of re-graveling. We conclude that the trial court correctly decided this issue on first hearing and erred when the judgment was amended.
Under the servitude reservation plaintiff and his ancestors in title assumed total responsibility for the maintenance of the lane or outlet. Kaiser and his successors in title never participated in or contributed to the maintenance of the outlet. The passage from U.S. Highway 165 to the parking lot and from thence to the tennis courts has been continuously maintained by the Country Club. The major portion of the lane from the Club parking lot to the gate opening into the 69 acre tract was never more than a dirt road. The record clearly reflects that the roadway which was used, and in the location where it was used, was no less passable by automobiles at the time of trial than it ever was. Under these circumstances we do not consider the action of the defendant in removing the gravel placed by it on this short stretch of roadway surface to be a change in the condition of the premises as envisioned by R.C.C. Article 777, nor do we conclude that plaintiff's right of use has been diminished or made more inconvenient. Accordingly, plaintiff is not entitled to have the defendant restore this short stretch of road to its former condition or to pay damages.
For the above and foregoing reasons we affirm the trial court judgment in part and reverse same in part and reverse same in part to the end that the decree portion thereof will provide as follows:
"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:
1. It was the intention of Naaman A. Kaiser and the Country Club that the outlet or lane granted to Kaiser in the Kaiser-Country Club deed with reference to property Kaiser acquired east of the Country Club property be for the advantage of the land itself and not expire at Kaiser's death.
2. The location of the right of passage was established by the process of use of the right and it is shown on exhibit P-3 as a white line (road and passage way running from Point A on U.S. Highway 165 to point B on the Kaiser-McLure property line). The right of passage is to be of a width of twelve (12) feet.
3. The Country Club will replace the gate opening into the McLure property and therefore no damages for its removal shall be allowed.
4. Alexandria Golf & Country Club, Inc. is permanently enjoyed from interfering with the exercise of the servitude of passage through their property to the property formerly belonging to Naaman Kaiser and currently owned by Thomas C. McLure.
5. All costs of this suit shall be assessed to the defendant Alexandria Golf & Country Club, Inc.
The costs of this appeal to be borne ½ by plaintiff-appellant and one-half by defendant-appellee.
AFFIRMED IN PART, REVERSED IN PART AND RENDERED.