| NEW ORLEANS & GULF | * | NO. 2020-CA-0493 |
| COAST RAILWAY COMPANY | | |
| | * | |
| VERSUS | | COURT OF APPEAL |
| | * | |
| AMERICAN MIDSTREAM | | FOURTH CIRCUIT |
| (LOUISIANA INTRASTATE), | * | |
| L.L.C. AND AMERICAN | | STATE OF LOUISIANA |
| MIDSTREAM PARTNERSHIP, | * * * * * * * | |
| L.P. | | |

APPEAL FROM
25TH JDC, PARISH OF PLAQUEMINES
NO. 62-281, DIVISION "A"
Honorable Kevin D. Conner, Judge
* * * * * *
**Judge Regina Bartholomew-Woods**
* * * * * *
(Court composed of Judge Joy Cossich Lobrano, Judge Rosemary Ledet, Judge
Sandra Cabrina Jenkins, Judge Regina Bartholomew-Woods, Judge Paula A.
Brown)

**LOBRANO, J., DISSENTS WITH REASONS**

**LEDET, J., CONCURS WITH REASONS**

**JENKINS, J., DISSENTS WITH REASONS**

**BROWN, J., CONCURS WITH REASONS**


Patrick A. Talley, Jr.
Lillian M. Grappe
PHELPS DUNBAR, LLP
365 Canal Street
Suite 2000
New Orleans, LA 70130

Harry Alston Johnson, III
PHELPS DUNBAR LLP
400 Convention Street
II City Plaza, Suite 1100
Baton Rouge, LA 70821-4412

      COUNSEL FOR PLAINTIFF/APPELLANT

Cheryl Mollere Kornick
Matthew D. Simone
LISKOW & LEWIS, APLC
701 Poydras Street
Suite 5000
New Orleans, LA 70139-5099

COUNSEL FOR DEFENDANT/APPELLEE

**VACATED AND REMANDED**
**May 28, 2021**

## FACTUAL BACKGROUND

In a 1916 foreclosure sale, Plaintiff-Appellant, New Orleans & Gulf Coast Railway Company ("NOGC"), acquired ownership of the property owned by New Orleans, Fort Jackson, and Grand Isle Railroad Company. The sale included a right-of-way for the railroad. NOGC constructed a railroad over the land. NOGC later obtained right-of-way servitudes from landowners on approximately one hundred two (102) tracts of land.

In 1999, Creole Gas Pipeline Corporation ("Creole") sought to construct a gas pipeline ("the Pipeline") on the same land which contained NOGC's servitude and obtained its own right-of-way servitudes from the landowners with the understanding that their rights were subordinate to NOGC's existing servitude rights.

NOGC objected to the pipeline because of the danger presented by the combustible natural gas that would flow through the pipeline. Notwithstanding its objection, on December 6, 1999, NOGC and Creole entered into a "Longitudinal Pipeline Encroachment Agreement" ("the Agreement") giving Creole permission to construct and maintain the pipeline for fifteen (15) years. Additionally, Creole agreed to compensate NOGC two hundred and fifty thousand dollars ($250,000.00) and maintain the pipeline in a safe condition in compliance with railroad industry standards for the purpose of safe operation of both the railroad and the pipeline. The Agreement further provided that if Creole or its successor terminated the Agreement, then NOGC could remove the pipeline at Creole's, or its successor's, sole expense.

In 2009, Defendant-Appellee, American Midstream ("AM"), became Creole's successor, in interest, as the result of various mergers and name changes.

On December 5, 2014, NOGC and AM began negotiations to renew the Agreement because the fifteen (15) year term was coming to an end. Prior to the expiration of the Agreement, AM notified NOGC that it did not intend to renew the Agreement because AM believed it no longer required the land for which the Agreement was made.

The Agreement expired on December 6, 2014. Notwithstanding, the expiration of the Agreement, AM continued to operate the Pipeline and asserted that it had entered into an agreement directly with the landowners; therefore, it did not need an agreement with NOGC.

## PROCEDURAL BACKGROUND

On June 12, 2015, NOGC filed a "Complaint in Trespass, Unauthorized Use of Immovable Property and Damages" against AM seeking damages for AM's continued use of NOGC's private property to run the pipeline, or in the alternative, the immediate cessation of operation and the Pipeline's removal with costs assessed against AM.

On August 12, 2015, AM filed an exception of lack of personal jurisdiction and a peremptory exception of failure to state a cause of action. A rule to show cause hearing was scheduled for October 5, 2015. On September 3, 2015, an "Unopposed Motion to Continue Exceptions Hearing" was filed by NOGC and the hearing was reset for December 7, 2015. On December 7, 2015, the hearing was again reset to allow the parties time to complete discovery.

On March 16, 2016, NOGC filed "Plaintiff's Motion for Partial Summary Judgment on the Issues of Removal of Natural Gas Transmission Line, Restoration of Property, and Indemnification" seeking a decree that NOGC has the right to remove the Pipeline at AM's sole expense; NOGC has the right to restore the property at AM's sole expense; and AM owes indemnity to NOGC for all costs and expenses incurred in the removal of the Pipeline and restoration. A rule to show cause hearing was set for May 16, 2016.

On May 16, 2016 a hearing was held regarding the motion for partial summary judgment whereupon the trial court took the matter under advisement.

3

On May 23, 2016, the trial court issued a judgment denying NOGC's motion for partial summary judgment reasoning that there were genuine issues of material fact associated with the Agreement which precluded enforcement of the Agreement.

Following a status conference, by telephone, on December 6, 2018, a pre-trial conference was set for April 17, 2020, and a bench trial was scheduled for May 4-8, 2020.

On October 25, 2019, AM filed a motion for summary judgment" seeking dismissal of all of NOGC's claims. On January 13, 2020, the trial court held a hearing regarding AM's motion for summary judgment and took the matter under advisement.

On January 20, 2020, the trial date was reset from May 4-8, 2020 to October 20-23, 2020.

On January 31, 2020, the trial court issued a judgment denying the motion for summary judgment, in part and granting the motion, in part. Specifically, the trial court denied the motion for summary judgment as it relates to the four tracts of land that are allegedly fee owned by NOGC. For the remaining tracts of land, the trial court granted the motion for summary judgment and dismissed all of NOGC's claims.

On February 13, 2020, NOGC filed a motion for new trial asserting the partial granting of the motion of summary judgment was contrary to the law and evidence.

The trial court scheduled a hearing for April 20, 2020 for AM to show cause as to why a new trial should not be granted. On May 1, 2020 the trial court issued a judgment denying the motion for a new trial.

On June 3, 2020, NOGC filed a "Motion to Designate Judgment for Appeal Pursuant To Article 1915(B) of The Louisiana Code of Civil Procedure." The trial court designated the January 31, 2020 ruling as a final judgment subject to appeal.

On June 15, 2020, NOGC filed a "Motion for Order of Devolutive Appeal," and the trial court granted the motion and set a return date for forty-five (45) days following the payment of costs. This appeal followed.

**ASSIGNMENTS OF ERROR**

NOGC asserts the following assignments of error:

1. The trial court erred in granting summary judgment because there were disputed material facts and competing expert evidence as to whether NOGC and AM held correlative rights in the property subject to NOGC's railroad right-of-way;

2. The trial court erred in granting summary judgment because it failed to consider the implications of the *St. Julien* doctrine, improperly precluded factual development related to that doctrine, and incorrectly applied the Louisiana Civil Code's predial servitude articles to NOGC's "extra-codal" railroad right-of-way; and

3. The trial court erred in dismissing all of NOGC's claims against AM related to ninety-eight (98) tracts of land making up NOGC's railroad right-of-way

5

because the district court did not address NOGC's possessory action or contractual claims, which were sufficiently pleaded in NOGC's original petition.

## DISCUSSION

*Jurisdiction*

The granting of a partial summary judgment must be declared a final judgment by the trial court in order to vest this Court with jurisdiction.

> B. (1) When a court renders a partial judgment or partial summary judgment or sustains an exception in part, as to one or more but less than all of the claims, demands, issues, or theories against a party, whether in an original demand, reconventional demand, cross-claim, third-party claim, or intervention, the judgment shall not constitute a final judgment unless it is designated as a final judgment by the court after an express determination that there is no just reason for delay.

La. C.C.P. art. 1915B(1); *Quarter Holdings, LLC v. Bufkin*, 2017-0671, p. 5 (La. App. 4 Cir. 2/21/18), 238 So.3d 525, 527 – 28.[1]

In the current case, the trial court granted a partial summary judgment triggering La. C.C.P. art. 1915B(1). NOGC requested the January 31, 2020 judgment be designated for appeal. The trial court, in issuing its designation stated the judgment was a final judgment and made an express determination that there was no just reason for delay. Accordingly, this Court has jurisdiction to consider this appeal.

*Standard of Review*

---

[1] This Court held the trial court's judgment was not an appealable final judgment when the trial court did not certify there was no just reason for delay of the appeal.

The standard of review for the granting of a partial summary judgment is *de novo*. *Espinosa v. Accor N. Am., Inc.*, 2014-0001, p. 5 (La. App. 4 Cir. 9/24/14), 148 So.3d 244, 249 (citing *Kimpton Hotel & Restaurant Group, Inc. v. Liberty Mut. Fire Ins. Co.,* 07–1118, 07–1209, 07–1310, p. 3 (La. App. 4 Cir. 12/19/07), 974 So.2d 72, 75).

*Law and Discussion*

This case involves the rights vested in servitudes and the effect of having multiple servitudes on a single property. Before addressing the trial court's granting of the partial summary judgment, an examination of the statutory and jurisprudential authorities pertaining to servitudes is required.

## I.    Servitudes

"The Civil Code provides that a person may have various rights in things." *Eagle Pipe & Supply, Inc. v. Amerada Hess Corp.*, 2010-2267 p. 10 (La. 10/25/11), 79 So.3d 246, 258 [hereinafter *Eagle*]. These rights are listed as: "(1) ownership; (2) personal and predial servitudes; and (3) such other real rights as the law allows." *Id*. (citing La. C.C. art. 476). Ownership confers "direct, immediate, and exclusive authority over a thing" including the rights of use, enjoyment, and disposal of the thing. *Id*. (citing La. C.C. art. 477(A)). An owner may grant a right of partial enjoyment or use of the thing to another without losing ownership, thus creating a servitude. *Id*.; *Faulk v. Union Pac. R.R. Co.*, 2014-1598, p. 12 (La. 6/30/15), 172 So.3d 1034, 1045. The acts establishing the servitude must be sufficient to transfer a real right and must be properly filed to be effective against

7

third parties. *Marina Enterprises v. Ahoy Marine Servs.*, 496 So.2d 1080, 1083 (La. App. 4th Cir. 1986).

There are two kinds of servitudes: predial and personal servitudes. La. C.C. art. 533; *Eagle Pipe*, 79 So.3d at 258. A predial servitude runs with the land, and a personal servitude is strictly for the benefit of the person. *Marina Enterprises*, 496 So.2d at 1083 (citing *Parkway Development Corporation v. City of Shreveport,* 342 So.2d 151 (La. 1977); *Hailey v. Panno,* 472 So.2d 97 (La. App. 5th Cir. 1985)).

*Predial Servitude*

A predial servitude is a real right that creates a burden on one estate for the benefit of a second estate. La. C.C. art. 646; *Marina Enterprises v. Ahoy Marine Servs.*, 496 So.2d 1080, 1082 – 83 (La. App. 4 Cir. 1986). The estate with the burden is called the "servient estate" and the estate reaping the benefit is the "dominant estate." *Id.* at 1082-83. The two estates must belong to different owners.[2] *Id.* "Predial servitudes are a charge upon the land, and thus follow it even when there is a change in its ownership." *Whitney Nat'l Bank of New Orleans v. Poydras Ctr. Assocs.*, 487 So.2d 120, 122 (La. App. 4 Cir. 1986) (citations omitted).

There are three (3) kinds of predial servitudes: natural, legal, and voluntary/conventional. La. Civ. Code Ann. art. 654; *Marina Enterprises*, 496

---

[2] *McLure v. Alexandria Golf & Country Club, Inc.,* provides a concise summary listing the essential features of a predial servitude as follows: "(1) two different estates, one owing the servitude to the [] other; (2) two different people, one person owning the benefited estate and the other person owning the encumbered estate; and (3) the object of benefiting the estate favored by establishment of the servitude." 344 So.2d 1080, 1090 (La. App. 3 Cir. 1977).

So.2d at 1083. A "natural" servitude arises from the natural occurring situations of the estates, such as water naturally draining from a highly situated estate to the estate situated below.[3] A "legal" servitude is one that is imposed by law for the benefit of the general public or a particular person, such as the "levee servitude" which allows for the construction and maintenance of levees and roadways on private land that borders rivers for the benefit and safety of the public.[4] "Voluntary" or "conventional" servitudes occur when the estate owner, either overtly or tacitly, agrees to the burdening of the estate, such as by granting a "right-of-passage" from an enclosed estate to a public road through another estate.[5]

Predial servitudes may be either non-apparent or apparent. *Phipps v. Schupp*, 2014-0672, p. 33 (La. App. 4 Cir. 3/18/15), 163 So.3d 212, 230 (citing La. C.C. art. 707). Non-apparent servitudes have no exterior sign of their existence. *Id.* at 230-31. Apparent servitudes are perceivable by exterior signs, works, or constructions, such as a roadway and may be acquired by title, by acquisitive prescription, or by destination of the owner. *Id.* at 230. Non-apparent servitudes may only be acquired by title. *Id.* at 231. A predial servitude is created by title when the grantor sufficiently expresses an intent to create the servitude in a title, deed, act of sale, or other document regarding use of the properties. *Williams v. Wiggins*, 26, p. 4 (La. App. 2 Cir. 8/17/94), 641 So.2d 1068, 1072. "[T]he title

---

[3] *Gaharan v. State Through Dep't of Transp. & Dev.,* 579 So.2d 420, 422 (La. 1991) (citing La. C.C. art. 655).

[4] "In Louisiana, title to riparian lands fronting on navigable rivers is subject to the superior right of the public's legal servitude for the making and repairing of levees, roads and other public and common works." *DeSambourg v. Bd. of Comm'rs for Grand Prairie Levee Dist.*, 621 So.2d 602, 606 (La. 1993).

[5] *See Phipps v. Schupp*, 2014-0672, pp. 19-21 (La. App. 4 Cir. 3/18/15), 163 So.3d 212, 223-25 (discussing the necessary elements to establish a servitude of passage).

creating them must be express as to their nature and extent, as well as to the estate that owes them and the estate to which they are due." *Id.* A predial servitude may be acquired by acquisitive prescription when the individual claiming prescription has used the servitude for ten (10) years in good faith, and with just title, or for thirty (30) years where either good faith or just title is not present. *Id.* at 1072-73 (citing La. C.C. art. 742). In order to create a predial servitude by destination of the owner, two estates owned by the same owner must have a relationship that would be a predial servitude if the estates belonged to different owners. *Phipps*, 163 So.3d at 231. When one of the estates no longer belongs to the same owner, the predial servitude comes into existence.[6] *Id.*

Predial servitudes may be extinguished in several ways. The servitude may be extinguished by ten (10) year liberative prescription of non-use. La. C.C. art. 753; *Bradbury v. Paul*, 365 So.2d 845, 847 (La. App. 4 Cir. 1978)("When no use is made of the servitude for ten years the subservient estate is freed of the servitude…."). When the estate changes in a manner that the servitude can no longer be exercised, or the dominant estate is permanently and totally destroyed, the servitude is extinguished. La. C.C. art. 751. If the changes are due to man-made changes to the servient estate, the changes will only end the servitude if the dominant estate expressly consents to the changes. *James v. Buchert*, 144 So.2d 435, 439 (La. Ct. App. 1962). "A predial servitude is extinguished when the dominant and the servient estates are acquired in their entirety by the same

---

[6] The owner may create an express provision denying the would-be servitude in which case, the servitude would not be created. *See Phipps*, 163 So.3d at 231; *Williams*, 641 So.2d at 1073.

10

person." La. C.C. art. 765; *City of New Orleans v. Bd. of Comm'rs of Port of New Orleans*, 148 So.2d 782, 786 (La. App. 4 Cir. 1962). Similarly, the owner of the servient estate may, by written act, abandon the estate or the portion of the estate to which the servitude is owed to the care of the dominant estate. La. C.C. art. 770. The owner of the dominant estate may renounce the servitude or voluntarily release the servient estate from the servitude. La. C.C. art. 771; *Cooper v. Lykes*, 218 La. 251, 256; 49 So.2d 3, 5 (1950). A predial servitude established for a set term or subject to a terminating condition extinguishes upon the expiration of the term or the happening of the condition. La. C.C. art. 773; *Whitney*, 487 So.2d at 123. When the title of the creator of the servitude is declared null or nonexistent, the servitude is extinguished. La. C.C. art. 774.

### *Personal Servitudes*

"A personal servitude is a charge on a thing for the benefit of a person." La. C.C. art. 534; *2400 Canal, LLC v. Bd. of Sup'rs of Louisiana State Univ. Agr. & Mech. Coll.*, 2012-0220, p. 10 (La. App. 4 Cir. 11/7/12), 105 So.3d 819, 826 n.10. "Personal servitudes confer upon a person a specified use of an estate less than full enjoyment and are governed by the laws of predial servitudes. *Faulk v. Union Pac. R.R. Co.*, 2014-1598, p. 14 (La. 6/30/15), 172 So.3d 1034, 1046; *Marina Enterprises*, 496 So.2d at 1083. Generally, personal servitudes terminate with the life of the person for whose benefit it was established, or according to the conditions set by the act creating the servitude. *Whitney*, 487 So.2d at 122. "There

11

are three [types] of personal servitudes: usufruct, habitation, and rights of use." La.

C.C. art. 534.

*Usufruct*

A "usufruct is a real right of limited duration on the property of another. The features of the right vary with the nature of the things subject to it as consumables[7] or nonconsumables."[8] La. C.C. art. 535; *Succession of Becker*, 96-2169, p. 9 (La. App. 4 Cir. 12/3/97), 704 So.2d 825, 830. The usufructuary (the owner of the usufruct) has the right to the use of the thing and all fruits of the thing subject to the usufruct. *Kennedy v. Kennedy*, 96-0732, p. 4 (La. 11/25/96), 699 So.2d 351, 353. Usufructs may be created by a juridical act (conventional usufruct)[9], or by operation of law (legal usufruct). *Darby v. Rozas*, 580 So.2d 984, 985 (La. 3rd Ct. App.). At the termination of the usufruct, the usufructuary is bound to return the items in the same quality and quantity or reimburse the naked owner for the value of the property. *Becker*, 704 So.2d at 830. The naked owner has the right to dispose of, alienate, or encumber the property, but must not interfere with the usufructuary's enjoyment of the thing. *Kennedy*, 699 So.2d at 353.

*Habitation*

---

[7] Consumables are items which are fully used up when put to use, i.e., money or food. *Kennedy*, 699 So.2d at 353 (quoting La. C.C. art. 536). The usufructuary over a consumable becomes the owner and may use, alienate, and/or encumber the consumable subject to reimbursement of the value of the consumable when the usufruct ends. *Id*. (quoting La. C.C. art. 538).

[8] Nonconsumables are items "'that may be enjoyed without alteration of their substance, although their substance may be diminished or deteriorated naturally by time or by the use to which they are applied, such as lands, houses, shares of stock, animals, furniture, and vehicles.'" *Becker*, 704 So.2d at 830 (quoting La. C.C. art. 537). The usufructuary over a nonconsumable has the right to possess an item and derive the use, profits, and any advantages produced by the item subject their duty to preserve the item and to return the item at the termination of the usufruct. *Id*. (quoting La. C.C. art. 539).

[9] "Conventional usufructs are of two kinds: contractual (created by an *inter vivos* juridical act) or testamentary (created by a *mortis causa* juridical act)." *Darby*, 580 So.2d at 985.

The personal servitude of a right of habitation is a "nontransferable real right of a natural person to dwell in the house of another." La. C.C. art. 630; *Crozat v. Louisiana Coastal, VII, LLC*, 2001-2404, p. 4 (La. App. 4 Cir. 9/11/02), 830 So.2d 319, 323. "A person having the right of habitation is entitled to the exclusive use of the house or of the part assigned to him and … may receive friends, guests, and boarders." La. C.C. art. 643. The right of habitation is established in the same manner as usufructs. La. C.C. art. 631 "The right of habitation terminates at the death of the person having it unless a shorter period is stipulated." La. C.C. art. 638. The right of habitation is not lost when the property is partitioned or sold. *Crozat*, 830 So.2d at 323.

*Right-of-use*

"The personal servitude of right-of-use confers in favor of a person a specified use of an estate less than full enjoyment." La. C.C. art. 639. The right-of-use may confer only an advantage that may be established by a predial servitude, such as a right-of-passage. *Sustainable Forests, L.L.C. v. Harrison*, 37,152 p. 4 (La. App. 2 Cir. 5/22/03), 846 So.2d 1283, 1285 (citing La. C.C. art. 640). The right-of-use is transferable by the initial grantee to others unless prohibited by law or the instrument creating the right. *Id.* (citing La. C.C. art. 643). The right-of-use is distinguishable from a predial servitude because with a right-of-use, there is no dominant estate. *Id.* Generally, a right-of-use affecting immovable property must be in writing. *Richard v. Hall*, 2003-1488, p. 18 (La. 4/23/04), 874 So.2d 131, 145.

NOGC's servitude is personal right-of-way servitude. "A railroad's right-of-way is a 'limited personal servitude,' rather than a predial servitude ... denominated by LSA–C.C. art. 639 as a 'personal servitude of right-of-use.'" *Faulk v. Union Pac. R.R. Co.*, 2014-1598, p. 12 - 13 (La. 6/30/15), 172 So.3d 1034, 1046 (citations omitted). Because there are not two estates at issue, there cannot be a predial servitude. Right-of-way servitudes in favor of railroads are regulated by the rules and laws governing usufruct and predial servitudes. *Bd. of Comm'rs of Port of New Orleans v. Illinois Cent. Gulf R. Co.*, 379 So.2d 838, 841 (La. App. 4 Ct. 1980) (citing La. C.C. art 645; *Farrell v. Hodges Stock Yards, Inc.*, 343 So.2d 1364 (La.1977)).

### St. Julien Doctrine

Beyond the methods of establishing a servitude provided for in Louisiana statutes, there is the *St. Julien* doctrine, an extra-codal method utility companies may use to create a personal servitude. This doctrine creates an exception to the writing requirement for right-of-use servitudes. Under this doctrine, a public or quasi-public corporation can acquire a servitude over the land of another. *Louisiana Power & Light Co. v. Holmes*, 422 So.2d 684, 686 (La. App. 3 Ct. 1982). This doctrine is a judicially-created rule providing a method of acquiring servitudes without formal proceedings. *Lake, Inc. v. Louisiana Power & Light Co.*, 330 So.2d 914, 915 (La. 1976) (citing *St. Julien v. Morgan Louisiana & Texas R.R. Co.*, 35 La. Ann. 924 (La. 1883)).[10] The servitude is created when a public or

---

[10] *Lake, Inc.*, prospectively overruled *St. Julien* as it relates to the creation of servitudes after 1976.

quasi-public company, having expropriation powers has: 1) used private property in the public interest; 2) in good faith; and 3) with the landowner's consent or acquiescence for a period of time. *Id.* "The landowner is precluded from reclaiming his property and is limited to an action for compensation for the value of the property taken and damages…." *Louisiana Power & Light Co.*, 422 So.2d at 686. If the landowner, at the time of the creation of the servitude, did acquiesce, then subsequent owners take the property subject to the servitude, even when no recording of the servitude is made. *Id.* at 687

Initially overruled by *Lake, Inc.*, the *St. Julien* doctrine was later codified in La. R.S. 19:14A, which states:

> A. In any case where the state or its political corporation or subdivision has actually, in good faith believing it had authority to do so, taken possession of privately owned immovable property of another, and constructed facilities upon, under, or over such property with the consent or acquiescence of the owner of the property, such owner shall be deemed to have waived his right to contest the necessity for the taking and to receive just compensation prior to the taking, but he shall be entitled to bring an action for such compensation, to be determined in accordance with the provisions of R.S. 19:9, for the taking of his property or interest therein, the just compensation to be determined as of the time of the taking of the property, or right or interest therein, and such action shall proceed as if the state, its political corporation, or subdivision had filed a petition for expropriation as provided for in R.S. 19:2.1.

The *St. Julien Doctrine* rules apply to the creation and or extinguishing of a servitude. "The *St. Julien* doctrine is inapplicable … where the only issue is possession." *City of New Orleans v. New Orleans Canal, Inc.*, 412 So.2d 975, 977 (La. 1981). Servitudes created by the *St. Julien Doctrine* are governed by the

15

Louisiana Civil Code pertaining to servitudes even when created outside of the codified rules. *See Borgnemouth Realty Co. v. Par. of St. Bernard*, 2013-1651 p. 8-9 (La. App. 4 Cir. 5/21/14), 141 So.3d 891, 899 (wherein this Court applied codal laws to affirm the trial court's ruling regarding a servitude established through the *St. Julien* doctrine).

### *Correlative Servitude Rights*

The owner of the servient estate may establish additional servitudes on the same land. La. C.C. art. 720; *Ogden v. Bankston*, 398 So.2d 1037, 1041 (La. 1981). The newer servitudes cannot adversely affect the rights of the estate or individual which acquired the servitude first. La. C.C. art. 720; *Ogden*, 398 So.2d at 1041. "[W]hen the owner has granted limited, nonexclusive rights to two parties to use the same property for different purposes, the two parties have correlative rights and obligations." *Inabnet v. Exxon Corp.*, 1993-0681, p. 15 (La. 9/6/94), 642 So.2d 1243, 1253. Should damage occur to either correlative servitude, liability is determined based on multiple factors such as:

> [T]he temporal order of the leases or other rights, the nature of the rights, the type of activities normally incidental to the use for which the rights were granted, the damage-causing party's knowledge of the existence of the damaged party's rights, the availability of alternative methods of exercising the right so as to cause little or no damage, and others.

*Jurisich v. Jenkins*, 99-0076 (La. 10/19/99), 749 So.2d 597, 604 n.7 (quoting *Inabnet,* 642 So.2d at 1252).

In the instant case, NOGC initially acquired servitudes on the properties, and the landowners allegedly granted AM right-of-use servitudes on the same lands.

This triggers the correlative rights doctrine with AM's later servitude subservient to NOGC's existing servitude.

## II. Analysis

NOGC asserts AM has no authority to continue to operate the Pipeline because the Agreement has expired. Conversely, AM argues the servitudes granted to it by the landowners directly eliminates the need for any agreement with NOGC. The trial court partially granted AM's motion for summary judgment after considering the affidavits of the experts, memoranda of the parties and the arguments of counsel.[11]

In the first assignment of error, NOGC asserts that because both parties put forth affidavits from experts which reached different conclusions the trial court erred in partially granting the summary judgment. NOGC argues the competing expert evidence created a genuine issue of material fact regarding the extent of correlative rights. For the foregoing reasons, we agree with NOGC's assertion and find that its assignment of error has merit.

"A motion for summary judgment will be granted 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law.'" *Indep. Fire Ins. Co. v. Sunbeam Corp.*, 99-2181, p. 7 (La. 2/29/00), 755 So.2d 226, 230 – 31 (quoting La. C.C.P. art. 966(B)). The mover bears the burden of proof while the adverse party

---

[11] The trial court dismissed the motion as it related to land that was alleged to be fee-owned by NOGC.

must produce factual evidence to support that a genuine issue of material fact exists. *Id.* (quoting La. C.C.P. art. 966D(1)).

Expert opinion evidence generally is admissible when considering a summary judgment. *Id.* at 235. When relying on expert opinions, the trial court is bound by certain principals.

> The first is that the trial judge **cannot make credibility determinations** on a motion for summary judgment. S*ee Sportsman Store of Lake Charles, Inc. v. Sonitrol Security Systems of Calcasieu, Inc.,* 99–C–0201, p. 6 (La.10/19/99), 748 So.2d 417 ("[t]he rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony"); [Frank L. Maraist and Harry T. Lemmon, *1 Louisiana Civil Law Treatise, Civil Procedure,* § 6.8, p. 145 (1999)] ("[i]n deciding a motion for summary judgment, the court must assume that all of the affiants are credible ..."). Second, **the court must not attempt to evaluate the persuasiveness of competing scientific studies**. In performing its gatekeeping analysis at the summary judgment stage, the court must "focus solely on the principles and methodology, not on the conclusions they generate." [*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595, n. 6, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)]. Third, the court "must draw those inferences from the undisputed facts which are most favorable to the party opposing the motion." Maraist & Lemmon, *supra,* p. 145. Fourth, and most importantly, summary judgments deprive the litigants of the opportunity to present their evidence to a jury and should be granted only when the evidence presented at the motion for summary judgment establishes that there is no genuine issue of material fact in dispute. If a party submits expert opinion evidence in opposition to a motion for summary judgment that would be admissible under *Daubert–Foret* and the other applicable evidentiary rules, and is sufficient to allow a reasonable juror to conclude that the expert's opinion on a material fact more likely than not is true, the trial judge should deny the motion and let the issue be decided at trial.

*Indep. Fire Ins. Co.*, 99-2181, p. 16-17, 755 So.2d at 236 (emphasis added). "[S]ummary judgment is generally inappropriate when a court is faced with competing affidavits." *Feist v. Ferguson*, 2011-0643 (La. App. 4 Cir. 11/23/11), 78 So.3d 838, 841 (Belsome, J., concurring) (citing *Hutchinson v. Knights of Columbus, Council No. 5747,* 2003 – 1533, p. 8 (La. 2/20/04), 866 So.2d 228, 234).

AM asserted that it had acquired servitudes directly from all of the fee-owners of the properties, thus creating correlative servitudes. NOGC, opposed this, asserting there was a genuine issue of material fact regarding whether AM did, in fact, acquire servitudes from all of the landowners. Both sides provided affidavits of experts and deposition testimonies regarding ownership of the tracts of land.

AM's expert, Elliott Stein's ("Mr. Stein"), affidavit asserted that AM received permission from all the landowners to run its pipeline.[12] NOGC countered with its own expert, Hugh McCurdy (Mr. McCurdy), whose affidavit asserted AM had not received permission for sixty-two (62) of the ninety-eight (98) tracts of land in contention; therefore, there was no correlative rights for the land which AM did not acquire servitudes. Additionally, NOGC alleges ownership of four (4) tracts of land and avers it has not entered into a servitude agreement with AM to allow the Pipeline to remain on its land.

---

[12] Despite the certainness of the affidavit, during his deposition, Mr. Stein testified he surveyed less than thirty (30) of the one hundred and two (102) tracts of land.

The trial court allowed the affidavits of both experts to be entered into the record; however, in its reasons for judgment,[13] the trial court made a determination that AM's assertion to have acquired permission from the fee-owners for all land except those owned by NOGC was fact and ruled there was no issue of material fact.[14] In reaching this conclusion, it becomes obvious that the trial court relied on AM's experts to the exclusion of NOGC's experts assertion that AM did not get permission for all of the tracts of land, thus giving unequal weight to AM's expert; thus improperly conducting a credibility determination.

Stated otherwise, we find that the trial court failed to follow the principles established in *Indep. Fire Ins. Co.*, when it accepted the assertions of AM's expert over the assertions of NOGC's expert. When even a scintilla of credible evidence is presented in opposition to a motion for summary judgment, the trial court is expected to err on the side that opposes the motion. 755 So.2d at 236. We find that the competing conclusions of the experts created a genuine issue of material fact such that the granting of summary judgment was inappropriate.

Because we find a genuine issue of material fact exists such that summary judgment was inappropriate, thus finding that NOGC's first assignment of error

---

[13] We recognize that "reasons for judgment only set forth the basis for the court's holding and are not binding." *Scott v. Am. Tobacco Co.*, 2015-1352, p. 11 (La. App. 4 Cir. 5/25/16), 195 So.3d 624, 630.

[14] The trial court wrote in its reasons, "[NOGC] argues there are three genuine issues of material fact that preclude summary judgment: (1) Whether the Railroad has full, or fee, ownership of any of the 102 tracts of land upon which American Midstream's Pipeline sits; (2) Whether American Midstream has a valid pipeline right-of-way from the landowners of each of the 102 tracts of land upon which the Pipeline sits…." After discussing the competing experts' affidavits regarding the land fee-owned by NOGC, the trial court wrote, "As to the other tracts of land at issue, the first two issues of material fact the Railroad alleges have no merit."

meritorious, we pretermit discussion of the remaining assignments of error raised herein.

## CONCLUSION

For the forgoing reasons, the judgment of the trial court is vacated and this case is remanded for further proceedings.

**VACATED AND REMANDED**